IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| BRENDA BARNETT, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 07-cv-1036 |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM ORDER

CONTI, District Judge

*Introduction*

Pending before this court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claims of Brenda Barnett ("plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381, et seq., and Disability Insurance Benefits ("DIB") under Title II of the SSA, 42 U.S.C. §§ 423, et seq. Plaintiff asserts that the decision of the administrative law judge ("ALJ") should be reversed because the decision is not supported by substantial evidence and that the case should be remanded for the ALJ to consider properly all the evidence as presented. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's motion and grant defendant's motion because the decision of the ALJ is supported by substantial evidence.

*Procedural History*

Plaintiff filed the application at issue in this appeal on a protective basis on March 30, 2005, asserting a disability since December 23, 2004 due to knee and elbow problems, head pain, and high blood pressure. (R. at 73, 290.) On May 26, 2005, plaintiff's claims were initially denied. (R. at 26-30, 298-302.) A timely written request for a hearing before an administrative law judge was filed by plaintiff, and the hearing was scheduled for February 27, 2006. (R. at 20, 31.) Plaintiff, who was then 46 years of age, appeared with counsel and testified at the hearing. (R. at 307-89.) She testified she had driven a school bus for 13 years (R. at 320) and prior to that employment she was a cook at a prison (R. at 325), a cook, server and cashier at a tavern (R. at 329) and a manager of a floral department of a grocery store. (R. at 323). A vocational expert ("VE") was also present at the hearing, but he did not testify. (R. at 307-89.) After the hearing, the VE on May 16, 2006, provided responses to interrogatories posed by the ALJ. (R. at 116-19, 382-83.)

In a decision dated August 23, 2006, the ALJ determined that plaintiff was not under a disability within the meaning of the SSA. (R. at 12.) The ALJ determined plaintiff had several severe and non-severe impairments; however, plaintiff had the residual functional capacity to perform light work activity. (R. at 14-15.) Plaintiff filed a timely request to review the ALJ's decision, which was denied by the Appeals Council on May 25, 2007. (R. at 5-7.) Plaintiff subsequently filed this present action seeking judicial review.

## Plaintiff's Medical History

### Dr. Witherite-Rieg

The earliest medical evidence of record reflects that plaintiff was evaluated by Dr. Lisa Witherite-Rieg on February 17, 2004. (R. at 124.) At the time of the office visit, plaintiff stated that since December 2003 she had been having intermittent head colds and sinus pressure with a severe left sided temporal headache. (Id.) Dr. Witherite-Rieg's notes indicated plaintiff did not have a prior history of migraines, but did have a history of hypertension with medication noncompliance, and a history of uncontrolled blood pressure. (R. at 127.) Due to plaintiff's elevated blood pressure she was admitted to the intensive care unit to receive treatment for her high blood pressure and cephalgia. (R. at 124.) Five days later, plaintiff was discharged without a headache and controlled blood pressure. (Id.) The discharge summary stated plaintiff was stable with a good prognosis; however, Dr. Witherite-Rieg recommended that plaintiff should not return to her job as a school bus driver until after the follow-up exam the next week. (R. at 125.)

On March 2, 2004, plaintiff saw Dr. Witherite-Rieg for her follow-up. (R. at 216.) Plaintiff stated that since her hospital stay, the excruciating headache pain went away and she only suffered from some mild headache pain. (Id.) Dr. Witherite-Rieg noted that plaintiff's blood pressure was controlled. (Id.)

Plaintiff's next appointment with Dr. Witherite-Rieg occurred on March 17, 2004. (R. at 214.) Plaintiff stated that she continued to have headache pain around a level of four or five on a scale of ten. (Id.) Plaintiff also reported having vertigo and feeling lightheaded and dizzy. (Id.) Dr. Witherite-Rieg's diagnosis included hypertension, persistent cephalgia, and vertigo. (Id.)

Two weeks later on March 31, 2004, plaintiff again followed-up with Dr. Witherite-Rieg. (R. at 213.) At that time, plaintiff stated that she was feeling a lot of better, the vertigo was mostly gone, and the head pain was not severe. (Id.) Dr. Witherite-Rieg noted that the hypertension was better controlled, the cephalgia was improving, and the vertigo was resolved. (Id.)

On December 14, 2004, Dr. Witherite-Rieg examined plaintiff for her bus driver's physical. (R. at 212.) Dr. Witherite-Rieg noted that plaintiff missed her last appointment and that plaintiff stated she was having difficulty obtaining health care, since she lost her health insurance. (Id.) Plaintiff stated she was experiencing ongoing headaches, but Toradol[1] provided some relief. (Id.) Dr. Witherite-Rieg noted that due to plaintiff's uncontrolled blood pressure, she could not certify her for a school bus driver physical. (Id.)

*Free Medical Clinic of Dubois*

On January 14, 2005, plaintiff underwent several tests ordered by the Free Medical Clinic of DuBois ("Free Clinic"). A retroperitoneal ultrasound indicated that plaintiff's kidneys and aorta were in normal condition. (R. at 242.) X-rays of the chest showed normal findings of the heart and no acute pulmonary process. (R. at 243.) The pulmonary function test indication a moderate restrictive pulmonary process. (R. at 251.)

Plaintiff visited the Free Clinic five times during the months of January, February, and April 2005. (R. at 231-35.) During her visits plaintiff described to various nurses she was experiencing knee pain, neck pain, elbow pain, and numbness of the arms and hands. (Id.) On

---

[1] Toradal is "a nonsterodial anti-inflammatory drug (NSAID), [and] is indicated for the short-term (up to 5 days in adults), management of moderately severe acute pain that requires analagesia at the opioid level. . . ." http://www.rxlist.com/toradol-drug.htm (last visited 11/24/2008).

4

January 4, 2005, plaintiff reported that she experienced high blood pressure and headaches all the time, which were severe at times. (R. at 231.) On January 18, 2005, plaintiff reported that her headaches improved. (R. at 232.) Reports from the Free Clinic diagnosed plaintiff with degenerative joint disease of both knees, hypertension, hyperlipidemia, chronic headaches, high blood pressure, and arthritis. (R. at 231-35.)

### Dr. Peck

On March 16, 2005, Dr. Eric Peck noted that plaintiff's hypertension was stable. (R. at 222.) Dr. Peck's notes indicate that plaintiff had experienced severe headaches, but the severity of her headaches had decreased with the decrease in her blood pressure. (R. at 221.) Plaintiff also stated that she was receiving health care at the Free Clinic due to a lack of health insurance. (Id.)

On September 22, 2005, Dr. Peck completed a physical residual functional capacity questionnaire. (R. at 272-75.) Dr. Peck responded that he had seen plaintiff on March 16, 2005, June 6, 2005, and July 18, 2005. (R. at 272.) The diagnoses included degenerative joint disease, fibromyalgia syndrome, headaches, hypertension, increased lipids, and temporomandibular joint disease. (Id.) Dr. Peck assessed that plaintiff experienced pain, which frequently interfered with her attention and concentration. (R. at 273.) He also related that based on plaintiff's impairments she could sit thirty minutes at a time and stand fifteen minutes at a time. (Id.) Overall during an eight-hour work day she could sit less than two hours and stand less than two hours. (Id.) Additionally, plaintiff would need to walk every thirty minutes for a period of five minutes, she required unscheduled breaks every thirty minutes, and could not perform any lifting. (R. at 273-74.)

### *Dr. Zeliger*

Dr. Keith Zeliger, an orthopedic specialist, examined plaintiff on March 28, 2005, for pain in both knees. (R. at 224.) Dr. Zeliger's notes reflect that X-rays showed advanced Grade IV osteoarthritis of the left knee and Grade II in the right knee. (Id.) Dr. Zeliger recommended that plaintiff undergo hyaluronic acid injections in her knees. (Id.) If this treatment method failed, then the last alternative could be total joint replacement. (Id.)

Plaintiff underwent three injections for the left knee during May 2005. (R. at 258-60.) Plaintiff's insurance would not cover injections for the right knee. (R. at 258.) Three weeks after the injections, plaintiff stated that she experienced some relief. (R. at 257.) She was hoping for more relief, but expressed that she could probably live with it for quite a while. (Id.) Dr. Zeliger referred plaintiff to a rheumatologist due to her joint aches. (Id.)

### *Dr. Kratz*

On May 10, 2005, plaintiff underwent a neurological exam by Dr. Ruedier Kratz, a neurologist, as requested by Dr. Peck. (R. at 263.) Dr. Kratz's notes reflect that plaintiff had persistent left occipitoparietal head pain, which at times was severe. (Id.) Additionally, the notes stated the pain caused plaintiff to be hospitalized on one occasion and caused plaintiff to lose her job. (Id.) During the examination, Dr. Kratz found plaintiff to have abnormal sensation over the left parietal area of her head; whereas, taste, smell, motor tone, and strength were found to be normal. (R. at 264.) The diagnosis included left occipital neuralgia, peripheral vertigo (possibly related to the hearing loss), hearing loss, visual disturbance of unclear etiology, and hypertension. (R. at 265.) Dr. Kratz administered a left occipital nerve block injection and recommended it be repeated if it provided relief to plaintiff. (Id.)

At the follow-up visit on June 14, 2005, plaintiff stated that the injection did not relieve her pain. (R. at 262.) Plaintiff stated that she was experiencing additional pain in her neck, shoulders, elbows, and knees. (Id.) Dr. Kratz suggested that it may be an arthritis problem, rather than a neurological problem. (Id.)

### Dr. Shaw

On August 17, 2005, Dr. Marianne Shaw, a rheumatologist, examined plaintiff. (R. at 279.) The notes from this consultation indicate plaintiff complained of the gradual onset of joint pain beginning years ago. (Id.) Plaintiff also expressed back pain, hip pain, neck pain and numbness in her legs. (Id.) Plaintiff stated that the pain medicine alleviated her pain, but caused her to feel goofy. (Id.)

Dr. Shaw suspected plaintiff had arthralgias and myalgias caused by a combination of osteoarthritis and fibromyalgia. (R. at 280-81.) X-rays of plaintiff's knees showed osteoarthritis of both knees, which was worse on the left than the right. (R. at 283.) X-rays of plaintiff's lumbar spine and pelvis showed mild generalized osteopenia, possible compression deformity of the lower thoracic vertebrae, and decreased lordosis suggestive of muscle spasm. (Id.) X-rays of her cervical spine showed significant osteophyte formation and disc space narrowing. (Id.)

Plaintiff met with Dr. Shaw on September 26, 2005 for a follow-up exam. (R. at 277.) Plaintiff rated her pain at that time as 91 out of 100, but also stated that it changes a lot. (Id.) Plaintiff stated she was experiencing pain in her neck, as well as pain in the right side of her head into her jaw. (Id.) Additionally, plaintiff stated that she experienced pain in both knees, which felt like stabbing pain at times. (Id.) Dr. Shaw's notes listed headaches as a major problem, along with hypertension, stomach ulcer, esophageal reflux, and osteoarthritis. (Id.)

Two days later, x-rays of plaintiff's thoracic spine showed osteoarthritis with no definite compression fracture as previously viewed in the August x-rays. (R. at 282.) The laboratory results indicated negative rheumatoid and HLA-B27 findings. (R. at 278, 284-89.) Dr. Shaw recommended Neurontin[2] and Lidoderm[3] patches as possible treatment options. (R. at 278.)

### *Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. 42 U.S.C. § 405(g). This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to

---

[2] " Neurontin is an anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.
   Neurontin is used alone or in combination with other medications to treat seizures caused by epilepsy in adults and children who are at least 12 years old. Neurontin is also used with other medications to treat partial seizures in children who are 3 to 12 years old.
   Neurontin is also used to treat nerve pain caused by herpes virus or shingles." http://www.drugs.com/neurontin.html (last visited Nov. 24, 2008).

[3] The Lidoderm Patch is used for "[r]elieving pain associated with herpes zoster (shingles)" and "is a local anesthetic. It works by stopping nerves from transmitting painful impulses to the brain." http://www.drugs.com/cdi/lidoderm-patch.html (last visited Nov. 24, 2008).

substitute its own conclusions for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

*Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following phases: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents her from performing her past relevant work; and (5) if so, whether the claimant can perform any other work which exists in

the national economy in light of her age, education, work experience, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. Burns, 312 F.3d at 119. The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. Id.

In the instant case, the ALJ found plaintiff met the insured status requirements of the SSA through December 31, 2009; and with respect to the sequential evaluation found (1) plaintiff had not engaged in substantial gainful activity since December 23, 2004; (2) plaintiff suffers from residuals of a total left knee replacement and osteoarthritis of the right knee, which are severe impairments, and that medical evidence reflects the following impairments: hypertension, parietotemporal head pain, substernal chest pain with shortness of breath, bilateral anterior thigh numbness radiating to the lumbar spine, partial hearing loss, visual disturbance autokinesis, fibromyalgia of the elbows and clavicle, gastroesophageal reflux disease and opiate dependence to pain medication, which were non-severe and were either resolved, controlled, or lacked medical evidence; (3) plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) since plaintiff has the residual functional capacity to perform light work activity not requiring standing and walking for more than four hours total in an eight-hour workday, with the additional limitation of a sit, stand, walk option for sedentary occupations, there were jobs in the national economy that plaintiff could perform. (R. at 14-17.)

Plaintiff raises three main issues:

1. Whether the ALJ erred in determining that plaintiff's headaches were not a severe impairment and not assessing the limitations from plaintiff's headaches at steps three through five of the sequential evaluation.

2. Whether the ALJ erred in improperly weighing the opinion of plaintiff's treating primary care physician.

3. Whether the ALJ failed to pose a hypothetical question to the VE which accurately reflected all plaintiff's functional limitations.

Each of these issues will be addressed.

*I. Whether the ALJ Erroneously Evaluated the Severity of Plaintiff's Headaches*

Plaintiff argues that the ALJ erred in holding that her headaches were not "severe" at step two of the five-step sequential inquiry. At step two, an administrative law judge determines whether the claimant has a medically severe impairment or combination of impairments. See Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987). Social security regulations provide that "[i]f you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we [the Social Security Administration] will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. §§ 404.1520(c), 416.920(c). Basic work activities are defined as the "abilities and aptitudes necessary to do most jobs. Examples of these include . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1).

In McCrea v. Barnhart, 370 F.3d 357, 360 (3d Cir. 2004), the court stated that the "burden placed on an applicant at step two is not an exacting one." The step two inquiry has been described as a "de minimis screening device to dispose of groundless claims." Newell v. Barnhart, 347 F.3d 541, 546 (3d Cir. 2003). "A claim may be denied at step two only if the

11

evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Social Security Ruling 85-28, 1985 WL 56856, at *3. In <u>Newell</u>, the court of appeals stated that "[r]easonable doubts on severity are to be resolved in favor of the claimant." <u>Newell</u>, 347 F.3d at 547.

Although the burden on plaintiff at step two is not heavy, substantial evidence supported the ALJ's determination that plaintiff's headaches are not a severe impairment. The ALJ noted that plaintiff's head pain "improved with a reduction in her blood pressure," and that plaintiff's neurologist determined that "there were no neurological problems." (R. at 16 .) The ALJ relied on plaintiff's testimony that she was completing a home exercise program to reduce her dependency on pain pills, caring for her personal needs, sweeping, washing dishes, watching television, using the computer, reading, eating out, working on crafts, and visiting with her brother. (R. at 17.) The ALJ's assessment is consistent with the medical evidence and plaintiff's testimony. Substantial evidence supports the ALJ's finding that plaintiff's headaches do not significantly limit her physical or mental ability to do basic work activities and are not severe.

Even if an administrative law judge errs in finding that an impairment was not severe, the error is harmless when the administrative law judge finds other severe impairments at step two and proceeds with the sequential analysis on the basis of plaintiff's severe and non-severe impairments. <u>See</u> <u>Lee v. Astrue</u>, 2007 WL 1101281, at **3-4 n.5 (E.D.Pa. Apr. 12, 2007); <u>see also</u> <u>Salles v. Comm'r of Soc. Sec.</u>, 229 Fed. App'x 140, 145 n.2 (3d Cir. 2007). The ALJ found plaintiff's residuals of a total left knee replacement and osteoarthritis of the right knee were severe. (R. at 14.) The ALJ proceeded with the sequential analysis and considered whether

plaintiff's severe impairments, along with her additional limitations, affected her residual functional capacity. (R. at 15-18.) Therefore, even if the ALJ had concluded that plaintiff's headaches were severe impairments, that finding would not have changed the ALJ's assessment and any error was harmless.

## *II. Whether the ALJ Erroneously Weighed the Opinion of the Treating Physician*

Plaintiff argues that the ALJ erred in affording little weight to Dr. Peck's assessment of disability. (Pl.'s Br. at 12-20). The Commissioner will generally give greater weight to the findings and opinions of the claimant's treating physician. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In making disability determinations, an administrative law judge has a duty to consider the opinions of treating physicians and to give them substantial weight. Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). The administrative law judge cannot employ his own expertise against that of a physician who presents competent medical evidence. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). The opinion of a treating physician, however, is entitled to substantial weight only when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

An administrative law judge who does not afford controlling weight to the opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. (Id.) Among those factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that

13

tend to support or contradict the opinion. See 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). The Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An administrative law judge "must consider all the medical evidence and give some reason for discounting the evidence [he] rejects." Plummer v. Apfel, 186 F.3d at 429.

Plaintiff claims that Dr. Peck's opinion on September 22, 2005, that she could not perform a full eight hours of work per day, should be given controlling weight. The ALJ, however, discredited this finding because Dr. Peck did not provide treatment notes subsequent to March 16, 2005 to support his assessment of plaintiff. (R. at 16.) The ALJ pointed out that Dr. Peck noted plaintiff's headaches improved with a reduction in her blood pressure. (Id.)

The ALJ discussed other medical evidence present in the record that undermined Dr. Peck's opinion with respect to plaintiff's ability to work eight hours per day. Dr. Kratz, a neurologist, examined plaintiff on two occasions and concluded that plaintiff had no neurological problems. (Id.) The ALJ acknowledged that Dr. Zeliger, an orthopedic specialist, documented x-ray evidence of advanced osteoarthritis in plaintiff's left knee, but, an x-ray of the right knee indicated mild to moderate osteoarthritis. (Id.) The ALJ noted the right knee had full extension and flexion, as well as excellent medial lateral stability and the three Synvisc injections into the left knee provided moderate relief. (Id.) After the injections to her knee, plaintiff stated she had hoped for more improvement, but felt she could "probably live with it for quite a while." (R. at 257.) Lastly, the ALJ discussed the findings of Dr. Shaw, plaintiff's rheumatologist. Dr. Shaw reported findings consistent with a combination of osteoarthritis and fibromyalgia. (R. at 16.) Laboratory findings, however, indicated plaintiff was negative for

rheumatoid and HLA-B27. (Id.) A physical exam revealed no vertebral pain and no synovitis in the wrists or hands. (Id.)

Plaintiff argues that "[t]he preference for the treating physician's opinion is stated throughout Third Circuit case law." (Pl.'s Br. at 16). In Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000), the court of appeals held "the ALJ [must] accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Id. at 317 (quoting Plummer, 186 F.3d at 429, which quoted Rocco v. Heckler, 826 F.2d 1348 (826 F.2d 1348, 1350 (3d Cir. 1987)). Dr. Peck's opinion, however, was not based on a continuing observation over a period of time, as he only saw plaintiff on three occasions between March 16, 2005 and July 18, 2005. (R. at 272.) Dr. Peck only provided treatment notes from plaintiff's first visit with him on March 16, 2005. (R. at 217-21.) Plaintiff argues that the reason Dr. Peck did not treat plaintiff after March 2005 was due to a lack of health insurance and the record indicates that after plaintiff's March 2005 visit with Dr. Peck she obtained treatment from the Free Clinic, Dr. Shaw, and Dr. Zeigler. (Pl.'s Br. at 19; R. at 222-27, 228-55, 256-68, 269-75.) While the lack of health insurance is an explanation for not following up with Dr. Peck, it does not diminish the appropriateness of the ALJ's considering factors to determine the weight to afford to Dr. Peck's opinions, such as the length and frequency of Dr. Peck's treatment relationship with plaintiff and the evidence Dr. Peck provided to support his medical opinion of plaintiff. The medical evidence in the record obtained from several doctors plaintiff visited subsequent to March 2005 is inconsistent with Dr. Peck's opinion of disability.

Dr. Peck completed a physical residual functional capacity questionnaire. (R. at 272.) The questionnaire was mainly composed of various boxes or increments of time. (R. at 272-75.) Dr. Peck generally circled or checked a box for questions in order to describe plaintiff's ability. (Id.) The Court of Appeals for the Third Circuit has recognized that residual functional capacity reports unaccompanied by written narrative reports may not be substantial evidence. See Mason v Shalala, 994 F.2d 1058, 1065 (3d Cir. 1933); see also Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). As the ALJ stated in his decision, Dr. Peck failed to provide treatment notes subsequent to March 16, 2005 to support the assessment made in the residual functional capacity questionnaire. (R. at 16.)

To further contradict Dr. Peck's opinion of disability, the ALJ noted plaintiff's daily activities. In the decision, the ALJ stated that plaintiff testified at the hearing to the following activities: completing a home exercise program to reduce her dependency on pain pills, caring for her personal needs, sweeping, washing dishes, watching a lot of television, using the computer (before it broke), reading, eating out, working on crafts, and visiting with her brother. (R. at 17.) The ALJ determined that plaintiff was not capable of performing any past relevant work; however, she was capable of performing other jobs based on her age, education, work experience, and residual functional capacity. (Id.)

Substantial evidence supports the ALJ's determination to afford little weight to the opinion of plaintiff's treating physician, Dr. Peck. The ALJ adequately evaluated all the relevant evidence and explained the basis of his conclusions. The ALJ stated that the opinion of plaintiff's treating physician, Dr. Peck, was entitled to little weight based upon the lack of treatment notes, as well as other medical evidence which undermined Dr. Peck's opinion.

Plaintiff's testimony about her activities also did not support Dr. Peck's disability determination.

### III. Whether the ALJ Failed to Pose a Hypothetical Question to the VE which Accurately Reflected All Plaintiff's Functional Limitations

Plaintiff's final argument is that the ALJ's hypothetical question to the VE did not accurately reflect all her functional limitations. (Pl.'s Br. at 21-22.) Plaintiff claims that the ALJ's hypothetical failed to include any of the limitations, such as difficulty standing and walking, as set forth by plaintiff's treating physician, or any reference to the limitations the plaintiff's headaches caused. (Id.)

As discussed previously, the ALJ afforded little weight to Dr. Peck's assessment of plaintiff. (R. at 16.) The ALJ's determination was based upon the lack of treatment notes provided by Dr. Peck, Dr. Peck's notes indicating that plaintiff's headaches improved with a reduction in her blood pressure, and other medical evidence of record which undermined Dr. Peck's opinion. (Id.) The ALJ did not adopt Dr. Peck's assessment, which consisted of treatment notes from one office visit and a residual functional capacity questionnaire. (R. at 217-21, 272-75.)

The ALJ examined the medical evidence of record regarding plaintiff's severe impairments, as well as additional limitations, and determined that plaintiff could perform light work. (R. at 15.) The ALJ placed several conditions on the type of light work plaintiff could perform. The ALJ limited the hypothetical person to simple, repetitive, routine work not requiring more than simple work-related decisions; work not requiring standing and walking for more than four hours total in an eight-hour workday; only occasional kneeling, crouching, crawling, or climbing of ramps and stairs; no use of ladders, ropes, or scaffolds; no frequent pushing/pulling with her lower extremities, including the use of pedals (unless the force required

to operate the pedals was less than five pounds); no prolonged exposure to cold temperature extremes or extremes of wetness/humidity; and no exposure to unprotected heights or dangerous machinery. (Id.) The ALJ found that plaintiff could perform sedentary occupations; however, additional limitations were imposed for this level of work such as a sit, stand, walk option which would allow plaintiff to walk four or five steps away from the work station for less than one minute up to five times an hour. (Id.)

The ALJ took into consideration the medical evidence regarding plaintiff's knee impairments, and found that this evidence supported a limitation of standing and walking for no more than four hours total in an eight-hour work day. (Id.) In addressing the headaches of plaintiff, the ALJ restricted the hypothetical to jobs involving simple, repetitive, routine work, which required only simple work-related decisions. (Id.) The hypothetical included the simple work limitation even though the ALJ determined that the plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (R. at 16.) The ALJ provided the additional limitation because plaintiff testified as having difficulty with memory and concentration, and relied on her husband to do tasks such as managing the checking account. (R. at 368, 370-72.)

The VE indicated that the hypothetical individual would be capable of performing jobs locally and in the national economy. (R. at 118.) The hypothetical posed was based upon plaintiff's functional limitations that were supported by the medical evidence; therefore the hypothetical was not defective. The VE's testimony constitutes substantial evidence that plaintiff was not disabled. See Plummer v. Apfel, 422, 431 (3d Cir. 1999) (stating that the vocational expert's testimony in response to a hypothetical that fairly set forth every credible

limitation established by the physical evidence can be relied upon as substantial evidence supporting the administrative law judge's conclusion).

## *Conclusion*

After consideration of the cross-motions for summary judgment and the record, the court finds that substantial evidence exists in the record which supports the ALJ's conclusion that plaintiff does not have a "disability" as defined in the SSA, and is not entitled to a period of disability, DIB, or SSI payments. Plaintiff's motion for summary judgment is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

By the court,


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated: November 25, 2008